CASE 95—INDICTMENT—DECEMBER 7, 1882.

# Loving v. The Commonwealth.

APPEAL FROM WARREN CIRCUIT COURT.

1. It is a rule of evidence that a witness cannot be cross-examined upon facts collateral and irrelevant to the issue for the purpose of contradicting him, his answers as to such facts being conclusive against the party calling him.

2. A witness who fails to testify as to substantive facts cannot be asked if he has not made statements to others, out of court, that such facts exist for the purpose of proving that he had made such statements, as that would be an attempt to make declarations out of court substantive testimony.

3. The errors complained of as to the formation of the jury will not be considered, as no exceptions were taken.

4. The instructions fairly expound the law applicable to the issue.

R. RODES AND WRIGHT & McELROY FOR APPELLANT.

1. The court erred in the formation of the jury. (Crim. Code, secs. 190, 191, 192.)

2. Erred in instructions to the jury.

3. The court certainly erred in permitting the cross-examination of Taylor and Jackson. (Crim. Code, secs. 281, 199; Brady vs. Commonwealth, 11 Bush, 351; Kennedy v. Ib., 14 Ib., 354.)

P. W. HARDIN, ATTORNEY GENERAL, FOR APPELLEE.

1. The court will see that Taylor was proven to be of bad character, and not worthy of belief.

2. The testimony of Jackson amounts to nothing. Neither should be shielded from contradiction by a convenient want of memory.

3. There is no error in the instructions.

4. No exception was taken as to the formation of the jury.

·CHIEF JUSTICE HARGIS DELIVERED THE OPINION OF THE COURT.

On the afternoon of the 22d of February, 1881, John Loving, a single man, thirty-one years ôld, living about three miles from Bowling Green, in which his mother re-·sided, came into that town without any "especial business."

After being about the town in different public places, and ·drinking two glasses of beer, near midnight he stopped in at Johnson's saloon, where he found a man by the name of Hines and the bar-keeper Grubbs. They soon engaged in throwing dice for beer, and he there drank two glasses of beer.

Hines settled for what he lost and went out, and Loving then went to settle with Grubbs for what he lost, and an altercation ensued between them, which attracted the atten-tion of his brother, the appellant, L. L. Loving, who came from the billiard-room to the door of the saloon, and in-quired what was the matter. On being informed, he said, in substance, if there was any fighting to do he would do it, or he would settle it, or "let me settle it."

He then returned to the billiard-saloon, apparently to resume the game in which he was engaged. The witnesses differ widely as to the conduct of Grubbs, the evidence of some of them tending to prove that, so soon as the appellant made the statement that he would do the fighting or settle it, Grubbs looked angrily at him, went behind the bar coun-ter, and reached under or above it, and immediately came out and across a small room located between the saloon and billiard-room, saying in a loud tone, "I can clean out the whole damn kit," "you can't scare me," with his hand in his pocket, and while approaching the door of the billiard-room and across the hall which separated it from the small ·or "stove" room through which he had passed, Grubbs was

shot and killed by the appellant, who was in or near the billiard-room door, and towards whom Grubbs was advancing at the time.

Buckner Duncan, a young man twenty-one years old, a clerk in his father's store, testified that "Grubbs appeared in the door of the stove-room and said: 'Now, God damn you, if both of you want to jump on me, I can clean out the whole kit.' Defendant turned around immediately and asked Grubbs what he said, and Grubbs repeated it, and kept coming straight toward the defendant, who was standing in the pool-room (billiard-room) door. I thought from Grubbs' manner there was to be a fight, and I jumped behind the wall and grabbed defendant to pull him also behind the wall, telling him he might get hurt. Just as I did this, defendant pulled his pistol and fired."

Other evidence in the case tends to prove that Grubbs had his hand up, with palm extended, at the time he was shot, and that his words were not so offensive or threatening as detailed by the appellant's witnesses.

Whether the witnesses for the Commonwealth, or those for the appellant, correctly stated what was said and done, is a question belonging to the province of the jury, and we only suggest its conflicting character for the purpose of an intelligent understanding of the questions of law raised upon this appeal.

It appears that the door opening into the hall where Grubbs was shot was the only door to the billiard room; that a pistol was kept in a drawer behind the saloon counter, and that one of the attendants about the establishment slept in a small room cut off from the "stove" room with a pistol under his head.

When Grubbs' body was examined by the coroner there was no pistol found on it.

In view of the circumstances of this case, it became important for the appellant to show, when Grubbs was shot, that he had a pistol on his person, and there was reasonable grounds to believe that he intended to use it on the person of the appellant.

And for the purpose of showing that Grubbs had a pistol, the appellant introduced as a witness a man by the name of Taylor, who testified that he was present immediately after Grubbs was shot, and sat up with the body that night; that before the coroner came, J. B. Johnson, the owner of the saloon and uncle of Grubbs, came in "and walked once or twice back and forth, and then went up to the body, reached over the body, felt under it, and when he straightened up he had a pistol in his right hand. He then put the pistol up his left sleeve, and as he did so said, 'Boys, say nothing about this,' and went into the bar-room behind the counter." He also stated that J. A. Jackson was present sitting on a beer keg rather in the corner at the time Johnson took the pistol from Grubbs' body.

Jackson was then introduced as a witness, and testified as follows:

"I was sitting on a keg in the hall; Taylor was standing up near the corpse, and between me and the body; Johnson came in the hall up to the body, and leaned over it, and seemed to be 'fumbling' some little time—two or three minutes; just as he straightened up he said, 'Say nothing about this, boys,' and went into the next room; I was on a keg in the corner next to State street, and Johnson's back was to me; I did not see the pistol; Taylor was between *me* and Johnson when the latter leaned over the body."

Loving v. The Commonwealth.

On cross-examination, in response to a question by the Commonwealth, Jackson said :

"I did not say to M. L. Low, after the killing of Grubbs, .that no pistol was taken from Grubbs' person."

The Commonwealth introduced M. L. Low in rebuttal, who testified "that J. A. Jackson told him that he knew nothing about a pistol on Grubbs."

To the testimony of Low the defendant properly reserved -exceptions, and we are now compelled to decide whether that portion of his evidence quoted was relevant.

It is a rule of evidence that a witness cannot be cross-examined on facts which are collateral and irrelevant to the issue for the purpose of contradicting him, his answers about such facts being conclusive against the party calling for them.

Nor can a witness who fails to testify to substantive facts .be asked if he has not made statements to others out of -court that such facts exist, for the purpose of proving that he had made such statements, as that would transform declarations made out of court, and not under the sanction of an -oath, into substantive testimony.

These rules of evidence received the sanction of this court .in the cases of Kennedy v. The Commonwealth, 14th Bush, .360, and Champ v. The Commonwealth, 2 Metcalfe, 24.

The evidence of Low did not contradict any statement -sworn to by Jackson, as he did not testify that he saw or knew that any pistol was on Grubbs.

What Jackson saw Johnson do and heard him say might have all been true, and yet Jackson still "know nothing about a pistol on Grubbs."

The Commonwealth seemed to be unwilling to undertake .to prove by Jackson on the witness stand that "he knew

nothing about a pistol on Grubbs," but resorted to the testimony of Low to establish Jackson's want of knowledge on that subject by proving the latter's declarations out of court.

The object of this testimony was to show, by negative declarations not made on oath, that Grubbs did not have a pistol on his person when advancing toward the appellant. That such evidence would so impress the mind of the jury is clear, because Jackson was present when Taylor swears Johnson took the pistol from Grubbs' person, and had an opportunity to know something about a pistol being on Grubbs. This character of testimony, therefore, is in violation of the rule of evidence last stated, which forbids the proof of declarations made out of court as substantive evidence in court. Such declarations are purely hearsay, and not competent evidence.

The effort made by the Commonwealth thus to establish the unarmed condition of Grubbs, if there were nothing else in the case about his condition than the testimony of Taylor, Jackson, and Low, might not be prejudicial to the appellant's substantial rights. But the significant failure on the part of the Commonwealth to introduce or account for the absence of J. B. Johnson, who knew better than any one else whether Taylor and Jackson were telling the truth or not, too plainly discloses the object of proving Jackson's declarations made out of court, and reveals a practice neither beneficial nor pleasing to the Commonwealth.

Johnson was the uncle of Grubbs, and had no motive to testify too favorably for the appellant, but every incentive common to humanity to disprove their statements, and especially those of Taylor, if false; hence, there must have been some improper reason for the omission to introduce him as a witness on the important point as to whether

Grubbs had a pistol when killed, and the resort to testimony of what Jackson had said out of court, and the impeachment of Taylor's general reputation.

We need not comment upon the far-reaching effect that a successful attack upon the testimony introduced for appellant to prove that Grubbs had a pistol would have had in this case. A suggestion is sufficient. The testimony of John Loving and Buckner Duncan, to the effect that Grubbs went behind the counter in the bar-room immediately after the appellant had said he would do the fighting, if any was to be done, and came out, moved, and talked as described above, would have been shorn of the inference that he went behind the counter to get the pistol which was kept under the counter, and cast suspicion upon the truthfulness or accuracy of their statements relative to the whole affair, and left appellant in the attitude of having shot Grubbs knowing he was unarmed, or under the mistaken belief that he was armed when he was not. Such consequences are too important to allow them to be produced or supported by evidence of the declarations of Jackson which he made out of court, but failed to prove in court. "It is enough for this court to know that it may have operated to the prejudice of the appellant;" then it becomes our duty to declare such evidence inadmissible.

But this is not all. The question put to Jackson and his answer, were not about the same matter to which Low testified. Jackson may have told the truth in his answer to the question, and so may Low have testified truthfully, as there is no conflict between their evidence.

To the question put, Jackson answered: "I did not say to M. L. Low that no pistol was taken from Grubbs' person."

Had he made that declaration to Low, and had it been true, then it would have been clear that Jackson knew that no pistol was on the person of Grubbs, as he must have known he had none, to truthfully say, that "no pistol was taken from Grubbs' person."

Jackson denied having made the declaration, and in order to contradict him, as we must suppose—for we have just shown the declaration was otherwise incompetent—Low was introduced, and against appellant's objection testified, not that Jackson said "*no pistol was taken from Grubbs' person*," but that "*he knew nothing about a pistol on Grubbs.*" The latter statement, to which Low testified, is not contradictory of Jackson's denial of the former, which he was asked if he did not make; for while Jackson may have known nothing about a pistol on Grubbs, it does not follow that he knew no pistol was taken from Grubbs.

And if his declarations, as stated by Low, were contradictory of the circumstances which Jackson testified to in corroboration of Taylor, Jackson was entitled to be inquired of, first, if he had made the declaration in terms or substance, and given an opportunity to deny or explain it. This was not done, and the testimony of Low was therefore incompetent, and prejudicial to the substantial rights of the appellant.

The errors complained of relative to the formation and selection of the trial jury cannot be considered, as there were no exceptions taken to the mode of selecting the jury. The bill of exceptions signed by the impartial judge who conducted the trial, is conclusive of what occurred as to the failure to take exceptions by either party, there being no effort to show, in the mode required by law, that he was mistaken on this point.

Loving v. The Commonwealth.

The instructions fully and fairly expound the law applicable to the issues involved in this case, and as we understand the qualifications added by the court to instructions Nos. 1 and 3, they are in accord with the law, as held in the case of Farris v. The Commonwealth, 14th Bush, p. 366, where this court said that the jury "were not told, as they should have been, that the right to kill was dependent upon the further fact that there were *no other apparently safe means of escape from the then impending danger.*"

It would have been proper for the court to have given an instruction separately as to reasonable doubt substantially in the language of the Criminal Code on that subject; but the instructions, as given, did contain the law of reasonable doubt in effect, and. in a manner that could hardly have prejudiced the substantial rights of the appellant, as the jury were instructed that they must believe from the evidence, beyond a reasonable doubt, that he shot and killed the deceased with malice, or in sudden heat and passion, and not in self-defense, before they could find him guilty of any degree of the offense.   No other error than the one pointed out in the beginning of this opinion is perceived; but for the error, in admitting the testimony of Low, the judgment is reversed, and cause remanded, with directions to grant appellant a new trial, and for further proper proceedings.