## The Liverpool & London & Globe Insurance Company v. Wright and Allen.

## Old Colony Insurance Company v. Wright and Allen.

## Citizens Fire Insurance Company v. Wright and Allen.

## People's National Fire Insurance Company v. Wright and Allen.

(Decided March 27, 1914.)

### Appeals from Graves Circuit Court.

1.  Trial—Improper Argument—Prejudicial.—While ordinarily when a
    lawyer, in his argument to the jury, makes a statement of fact

wholly unsupported by the record, a reprimand by the court and an admonition to. the jury to disregard the statement will be sufficient, yet where the statement is of such a prejudicial nature that it may improperly influence the jury, the trial court should set aside any verdict obtained by the counsel so offending.

2. Insurance, Fire—Action to Recover—Evidence.—In an action to recover on certain fire insurance policies, evidence examined and held to sustain a verdict in favor of plaintiffs.

3. Verdict—Evidence—Sufficiency.—The finding of the jury on questions of .fact will not be disturbed unless it is palpably or flagrantly against the evidence.

4. Evidence—Hearsay—Exclusion.—In an action to recover on certain fire insurance policies, where the companies defended on the ground that the building in question was fraudulently burned at the instance of plaintiffs, evidence that a certain person had made the statement that such building and certain others "were all going to burn that night," was mere hearsay, and was properly excluded, where it did not appear that the statement was made in the presence of either of the plaintiffs.

5. Evidence—Witness—Impeachment—Prior Inconsistent Statements—Admissibility.—Where a witness states a fact prejudicial to the party calling him, the latter may be allowed to show that the fact does not exist, by proving that the witness had made statements inconsistent with his present testimony, but where a party introduces a witness to prove certain facts, and the witness states that they did not transpire, he cannot then introduce other witnesses to prove that the witness had said to them that the facts inquired about did transpire.

6. Evidence—Surprise—Error.—Surprise in the testimony of a witness affords no ground for a new trial unless the party surprised ask that the swearing of the jury be set aside and the trial postponed.

7. Evidence—Witness—Change of Testimony—Improper Influence—Error.—Where there is evidence that an important witness was tampered with and improperly influenced to change her testimony, and that such change of testimony resulted to the advantage of plaintiffs, a new trial should be granted, even though the evidence is not sufficient to connect plaintiffs with the transaction.

BUNK GARDNER and M. B. HOLIFIELD for appellants.

W. J. WEBB, B. C. SEAY, ROBBINS & THOMAS and MOORMAN & WARREN for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

These four cases were consolidated and heard together below. They involve the same questions, and will be considered in one opinion.

Plaintiffs, B. W. Wright and V. E. Allen, were partners in the purchase and handling of tobacco in Mayfield, Kentucky, during the season of 1911 and 1912. Their business was conducted in the name of B. W. Wright. They owned a lot of tobacco, which was stored in a barn belonging to W. A. Asher and G. R. Allen father of V. E. Allen. On July 22, 1912, the tobacco was destroyed by fire. At that time plaintiffs carried insurance on the tobacco as follows: $2,000 in The Liverpool and London and Globe Insurance Company; $1,000 in the Citizens Fire Insurance Company; $1,000 in the Old Colony Insurance Company; and $1,000 in the Peoples National Fire Insurance Company, making a total of $5,000. The insurance companies having declined to pay the insurance, plaintiffs brought these actions to recover on the policies. The companies denied the value of the tobacco, and also defended on the ground that plaintiffs themselves either burned or caused to be burned the barn containing the tobacco for the fraudulent purpose of collecting the insurance. The four cases were tried jointly, and resulted in a verdict in favor of plaintiffs for $3,089. Judgment was then entered apportioning this sum against the companies in accordance with the amounts of their policies. From that judgment these appeals are prosecuted.

According to the evidence for the defendants the bottom had dropped out of the tobacco market. A fire broke out in the Gardner and Walker tobacco factory about eleven o'clock on the night of July 22, 1912. Mayfield has only one fire station. While the fire department was endeavoring to control this fire, a fire broke out in the Wright and Allen tobacco factory, a half mile away. To reach the latter factory, it was necessary for the fire wagon to pass over West Broadway. This street had been plowed, and it was difficult to move a fire wagon over it. On this account the city had placed a hand hose cart, together with 500 feet of hose, in the vicinity of the Wright and Allen barn. When one of the firemen left the fire wagon and rushed to this hose cart and attached the hose to the fire hydrant, he discovered that the wrench which he had seen buckled to the cart at six o'clock in the evening, and which was used in turning the water on, had been removed. By the time a new wrench could be secured, a large part of the Wright and Allen barn had burned to the ground. A large number of witnesses who attended the fires could

smell burning coal oil or gasoline. E. M. Shelton and Mrs. John Shelton saw a man rush from the Wright and Allen barn just before the fire flashed up, and cross the road through a small millet patch. About nine o'clock B. W. Wright was seen near the shed where the hand hose cart was located. Between ten and eleven o'clock he held a whispered conversation with Lee Perkins a short distance from his factory. Lee Perkins' house was burned on the same night. Perkins was arrested for arson and convicted, on a written confession in which he stated that Wood Gordon and B. W. Wright had arranged for him to burn the Wright and Allen tobacco barn so that they could "sell out to the insurance companies." He watched while Wright and Gordon fired the barn, and it was Wood Gordon who ran out of the barn and across the millet patch as E. M. Shelton and his daughter-in-law were passing. About ten minutes before the fire two witnesses met B. W. Wright within 50 yards of his barn and spoke to him. The first person to arrive at the barn after the fire met Lee Perkins running from the direction of the fire. The second person witness saw was B. W. Wright. He was sweating and fanning himself, and rubbing his arm. When the railroad agent heard the roaring of the fire he went to the telephone to telephone the fire department. While telephoning, B. W. Wright came in and said: "For God's sake, 'phone the fire department, for all the tobacco in town is on fire." One witness saw B. W. Wright cross the railroad coming from the direction of the barn, and rush into the depot. Wright's arm was burned, and a man who assisted Wright in holding the nozzle did not know of this fact. After the fire Wright requested Del Dowdy to allow Lee Perkins to sleep on his bed.

According to the evidence for plaintiffs, insurance on the tobacco in question to the amount of $2,000 was canceled just before the fire. The value of the tobacco on hand exceeded the amount of the insurance. Under the terms of the partnership, Wright was to do the buying and handling of the tobacco, while Allen was to furnish the money. The profits were to be divided equally between them. There was no motive for Wright to burn the barn, because he would receive no part of the insurance money, and no motive for Allen to do it, because the value of the tobacco exceeded the amount of the insurance. Wright and Wood Gordon deny that they had any conversation with Lee Perkins in reference to burn-

ing the barn, and deny that they were present or had anything to do with it, either directly or indirectly. They were not present when the barn was burned, nor were they in that vicinity. They were at their homes, and several witnesses corroborate them in this statement. Wright's arm was burned while handling the hose at the fire. When they got knowledge of the fire, both plaintiffs rushed to the scene and assisted in putting out the fire. When Wright went to a point near the hose cart, he did it for the purpose of answering a call of nature. After the fire Perkins and Wright were both arrested for arson. At first Perkins denied the charge. After repeated efforts to secure the aid of V. E. Allen, one of the plaintiffs, in arranging a bond, he made a confession, in which he implicated Wright and Gordon. The barn in which the tobacco was stored was worth about $1,500, and was insured for only $500.

The first error relied on is misconduct of one of plaintiffs' counsel in his argument to the jury. It appears that counsel had made certain remarks in regard to Calvin Eaker, a witness for defendants. Eaker resented these remarks, and made an attack on counsel outside of the court house. In this attack he inflicted certain bruises on counsel. Subsequently in his argument to the jury counsel pointed to the bruises on his face and said:

"You see these scars. Suppose I had been your lawyer and Calvin Eaker had demanded an apology and I had refused to make it. A man may be stronger and younger than me, but when I get to be such a coward as not to represent my client, I will leave the court house. I cannot be bullied by cutthroats, they may beat me but they cannot scare me. I want to defy the contemptible cutthroat that undertakes to defy me in my duty to my client."

In the same argument he referred to another witness for defendants in the following language:

"Hurd Kennedy is a moral reprobate, and for fifteen or twenty years he has been the burden of George Kennedy's life; and his father has been kept busy trying to keep him out of the penitentiary for years."

In referring to a witness by the name of Gamble, he said:

"Take Bill Gamble, a professional witness in this court house for twenty years."

While the last two statements were objected to, it does not appear that they were called to the attention of the court, or acted on by him. That being true, the language complained of affords no ground for reversal. Wright v. Commonwealth, 155 Ky., 754.

It does appear, however, that objection was made to counsel's reference to the scars growing out of the difficulty which he had with the witness Eaker outside of the court house. At the conclusion of the argument, the presiding judge told the jury that the objection to this statement was sustained. He also warned the jury that Eaker was not a party, and that counsel's statement in regard to him was not proper argument, and should not affect their verdict or be considered by them in reaching a verdict. Perhaps in the great majority of cases an admonition such as was given by the trial court would be sufficient to overcome the effect of improper argument, and such improper argument under the circumstances would afford no just ground for reversal. There are cases, however, where the improper argument of counsel is so prejudicial that no admonition of the court can remove the effect thereof from the minds of the jury. Here counsel went outside the record. He brought to the minds of the jury an occurrence which had nothing to do with the merits of the case. It was not an ordinary occurrence which could be considered by the jury and then dismissed from their minds as being of no moment. It brought to their attention the fact that one of the witnesses for the defendant had made a brutal assault upon counsel, and had inflicted upon him personal injuries which the jury could see for themselves. We have held that when a lawyer makes a statement of fact wholly unsupported by the record, the trial court should promptly reprimand him, and instruct the jury to disregard the statement. Ordinarily, this will be sufficient, but where the statement is of such a prejudicial nature that it may improperly influence the jury, the trial court should set aside any verdict obtained by the counsel so offending. Owensboro Shovel & Tool Co. v. Moore, 154 Ky., 431. The statement of counsel in this instance was certainly calculated to excite the prejudice and inflame the passions of the jury. If the statement, under the circumstances, was not calculated to do this, we are unable to think of a statement that would have such effect. Men naturally resent an unjustifiable attack by one man on another, and when a lawyer in a dramatic

manner stands in the presence of the jury and exhibits his scars, and calls attention to such an attack, the impression on the minds of the jury is such that it cannot possibly be removed by the mere statement of the court that the argument is improper and should not affect their verdict. Notwithstanding the admonition of the court, we conclude that the statement in question was sufficiently prejudicial to require a new trial, and to authorize a reversal here.

It is next insisted that the verdict is not sustained by the evidence. In this connection it is argued that the number of fires that occurred, the circumstances surrounding them, the fact that the bottom had dropped out of the tobacco market, considered in connection with the confession of Lee Perkins and Wright's conduct, as detailed by a number of witnesses, are sufficient to show conclusively that Wright either burned or had the barn burned. It must be remembered, however, that both Wright and Gordon contradicted the statements of Lee Perkins; that they claim to have been at their homes when the fire took place, and in this respect are corroborated by the other witnesses. It must also be remembered that there is evidence tending to show that the insurance was less than the value of the tobacco, and that Wright, for that reason, would be entitled to no part of the insurance money. On all of these questions the evidence, to say the least, is conflicting. In such a case it is not our custom to invade the province of the jury. It is only where the verdict is palpably or flagrantly against the evidence that we are authorized to interfere with the verdict. L. & N. R. R. Co. v. Price's Admr., 25 Ky. L. R., 1034; Williamson v. Bently, 158 Ky., 346. Much depends on the credibility of the witnesses. That is a question for the jury. We cannot say that the verdict is flagrantly against the evidence unless we say that plaintiffs' witnesses were not worthy of belief. This we have no right to do.

Another error relied on is the refusal to permit witnesses to testify that prior to the fire Lillie Pearson told them that Lee Perkins' house and Bolin Wright's barn were all going to burn that night. It is insisted that this evidence is competent because Lillie Pearson could not have made this statement without knowledge of the fact that the house and barn were to be burned. It does not appear, however, that this statement was made in the presence of either of the plaintiffs. It merely tends to

show that Lillie Pearson had knowledge of the fact that the fire was to take place. It in nowise connects plaintiffs with the fire. She may have gotten this knowledge from others. What she said, therefore, was mere hearsay, and was properly excluded.

It appears that on a former trial of these cases, and on the examining trial of Lee Perkins, the witness Lillie Riley Perkins testified that Wood Gordon came to Lee Perkins' house and she saw him talking to Lee Perkins and pointing to the Gardner and Walker tobacco factory and the Wright and Allen barn, but she did not understand the conversation. Later B. W. Wright came to see Lee Perkins, and she heard Wright tell Perkins that he was losing out in the tobacco business, and the only way he could save himself was to burn his barn and sell out to the insurance companies, but that this was graveyard talk. She further stated that on this occasion arrangements were made with Lee Perkins to burn the barn. When Lillie Riley Pearson was introduced by the defendants on the trial of these cases she was asked if previous to the time that Bolin Wright's barn was destroyed, she heard any conversation occur between Bolin Wright and Lee Perkins. She answered no. She was then asked if at any time before the fire Bolin Wright was over to Lee Perkins' house. She again answered no. She was also asked if Wood Gordon was over there. She said, "No." On being asked if at any time during any of the former trials she testified that she had heard Bolin Wright and Lee Perkins hold a conversation at her house in which Bolin Wright said he was losing money and had to sell out to the insurance companies, but that this was graveyard talk, she replied, "Lee Perkins got me to testify that. Yes." Thereafter defendants offered to prove by other witnesses that the witness Lillie Riley Pearson had stated on a former trial that she had heard such conversation between Wright and Perkins, and had also seen Wood Gordon at her house. This evidence was excluded, and defendants insist that this was error.

Section 596, Civil Code, is as follows:

"The party producing a witness is not allowed to impeach his credit by evidence of bad character, unless it was indispensable that the party should produce him; but he may contradict him by other evidence, and by showing that he has made statements different from his present testimony."

In interpreting this provision of the Code, it has been held that where a witness states a fact prejudicial to a party calling him, the latter may be allowed to show that the fact does not exist, by proving that the witness had made statements inconsistent with his present testimony. On the other hand, where a party introduces a witness to prove certain facts, and the witness states that they did not transpire, he cannot then introduce other witnesses to prove that the witness had said to them that the facts inquired about did transpire. Champ. v. Commonwealth, 2 Metc., 17; Loving v. Commonwealth, 80 Ky., 507; Blackburn, v. Commonwealth, 12 Bush, 181; Nicholson v. Rust, 21 Ky. L. R., 645, 52 S. W., 933; Bergman v. Solomon, 143 Ky., 581, 136 S. W., 1010; Duke v. Davis, 101 S. W., 390, 30 Ky. L. R., 1348, 125 Ky., 313.

In the present cases Lillie Riley Pearson was introduced by the defendants. She merely stated that the facts inquired about did not transpire. Her testimony was purely negative. She made no affirmative statement of fact prejudicial to the defendants. That being true, evidence of prior inconsistent statements was properly excluded. Left Fork Coal Co. v. Owens' Admx., 155 Ky., 220.

Another ground of complaint is the surprise growing out of the unexpected change in the testimony of Lillie Riley Pearson, coupled with the charge that the witness was tampered with. It is well settled that in ordinary cases of surprise a party must ask that the swearing of the jury be set aside and the trial postponed. If he fails to do this, surprise in the testimony of the witness affords no ground for a new trial. A party surprised cannot go on with the case and take the chances of a verdict in his favor, and then insist on a new trial because of such surprise. Thompson v. Porter, 4 Bibb, 70; Monarch v. Cowherd, 114 S. W., 276; Travellers Ins. Co. v. McInerny, 119 S. W., 171; Remley v. I. C. R. Co., 151 Ky., 796. Under the above rule, if this were a case of mere surprise, defendants, who did not ask that the swearing of the jury be set aside, and the trial postponed, would not be entitled to a new trial on the ground of surprise. But in addition to surprise, we have a case where it is charged that the witness was tampered with. The witness, Lillie Riley Pearson, herself makes affidavit that one Willard Byrn came to her house and offered her $25 to change her testimony. He wanted her to swear that B. W. Wright had not been to Lee Perkins'

residence for a year before the fire, and to say on the witness stand that the reason she had previously sworn that Wright had been at Perkins' house was because Perkins told her to. Five dollars was paid to her by Will Pearson before she went on the stand, and $20 more was promised her. It appears from the affidavits of others that her brother-in-law, Will Pearson, gave her two big drinks of whiskey just before she went on the stand. Two women who were present said that Will Pearson was continually in the room with witness, and talking to her in a whisper. There is an affidavit to the effect that Willard Byrn was frequently in conversation with Will Pearson. Before the trial Will Pearson and Willard Byrn were at the residence of Lillie Riley Pearson. Three livery rigs were furnished Will Pearson between March 26 and 29, 1913. On March 31, April 4, April 6 and April 7, other rigs were furnished. These rigs were furnished by Willard Byrn to Pearson, and were charged to Willard Byrn's account. Counter-affidavits were filed by plaintiffs and by Will Pearson and Willard Byrn. Plaintiffs denied all connection with or knowledge of any attempt to influence Lillie Riley Pearson to change her testimony. Willard Byrn admits that he was at Lillie Riley Pearson's residence on March 26, 1913, and says that while there Lillie Pearson volunteered the statement that Wright had not been to Lee Perkins' house within twelve months before the time of the fire. He claims that he made no suggestion whatever to her to change her testimony, and that he never offered to give, nor did he give her anything to change her testimony. He further says that all the statements contained in her affidavit are false. Willard Bryn filed an affidavit to the same effect.

For plaintiffs it is insisted that the evidence that the witness was tampered with is not only unconvincing and unsatisfactory, but utterly fails to connect plaintiffs with any improper attempt to influence her testimony. If the case depended on the affidavit of Lillie Pearson alone, there would be some merit in this contention. It clearly appears, however, that her testimony on the trial of these cases is entirely inconsistent with that given on previous trials. Her testimony on former trials was not only material, but very important. She now admits that her testimony on the trial under consideration is false. She gives as a reason for its falsity the fact that she was

promised $25 to change her testimony. While it is true that Will Pearson and Willard Byrn, through whom it is claimed that the negotiations took place, say that her statements are false in every particular; yet the conduct of these parties at the time of and subsequent to the trial, coupled with the fact that Will Pearson was in frequent conversation with the witness, and gave her two drinks of whiskey just before she went on the witness stand, and that Willard Byrn was furnishing him vehicles from the livery stable and charging them to his own account, affords sufficient corroboration of Lillie Pearson's own statements to justify the conclusion that she was tampered with and improperly influenced to change her testimony. It may be true that the evidence is not sufficient to connect the plaintiffs with the transaction, but the fact remains that they recovered a verdict, and that verdict is based in part on the fact that an important witness for the defendants materially changed her testimony, to the great surprise of defendants, and there is evidence that this witness was tampered with. The tampering with the witness has thus resulted to their advantage. In such a case the courts will not stop to inquire whether or not the party deriving the advantage is connected with the transaction. Every litigant is entitled to a fair trial. A trial is not fair when one of a party's chief witnesses has been improperly influenced to change her testimony. Justice should be administered in a manner to command respect for the law. Its channels should be kept clean and pure. A verdict reached through a polluted channel should not stand. We, therefore, conclude that the surprise occasioned by the change in Lillie Pearson's testimony, coupled with the circumstances tending to show that she was tampered with, is sufficient to authorize a new trial.

A reversal is also asked on the ground of newly discovered evidence. In view of the conclusion of the court in regard to other errors, we deem it unnecessary to discuss this question.

Judgment reversed and cause remanded for new trial consistent with this opinion.