## Johnson v. Commonwealth.

(Decided December 21, 1928.)

DAUGHERTY & BARNETT for appellant.

J. W. CAMMACK, Attorney General, and M. B. HOLIFIELD, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

Between 9 and 10 o'clock on the night of February 22, 1926, Eli Johnson shot and killed James Johnson.

For this he was indicted and tried for murder, convicted of manslaughter, and sentenced to the penitentiary for 16 years. He appeals.

Both defendant and deceased appear to have been engaged in the illicit manufacture of liquor. There had been ill feeling between them over some indictments about a year previous to the homicide, but they had compromised their differences and been on friendly terms for about six months. Deceased was at the home of defendant during the afternoon before the tragedy. Some time after dusk John McCoy dropped in and invited the two to go home with him and sit up for awhile with his sick child. They did this. After a time deceased left, and the other two later noticed his absence. The child being better, defendant started for home and McCoy accompanied him for the purpose of visiting a neighbor to procure him to intercede with the prosecuting witness in some indictments against McCoy. When they arrived at a place about 50 yards from the residence of defendant, they heard some one scream, and defendant rushed to the house. He testifies that he ran to the door, but it was latched on the inside and he could not open it; he then ran to one of the windows. The room was partially lighted by a coal fire and deceased was therein attempting to force defendant's wife to the bed. Defendant's two children, the elder of whom was eight years of age, occupied another bed. Deceased saw defendant and snatched a gun from the corner of the room and presented it at him; he immediately fired three shots at deceased from a pistol and ran around to the other window and shot again; all the shots were fired in self-defense, but he did not know whether he hit deceased or not. The deceased had the gun earlier in the afternoon and had loaded it and placed it in the corner where it was standing.

McCoy corroborates this statement in the main. He says he had a sore ankle and could not keep up with defendant after hearing the outcries, and met him near the house after the shooting was over. He went to the door and found it partially open; deceased was lying on the floor with the gun lying under his shoulder. His coat and shoes had been removed and his trousers were unbuttoned, Mrs. Eli Johnson was in one bed and the children in the other. They did not appear disturbed. Other evi-

dence for defendant was to the effect the deceased had boasted of illicit relations with Mrs. Eli Johnson and had sought to induce others to indulge in like intimacy. All of the above evidence was introduced by the defendant.

The commonwealth did not offer any of the eyewitnesses, but contented itself with proving the corpus delicti, the admission of the defendant that he did the killing, certain threats he had made against the deceased, and testimony by the wife of deceased that defendant had made an engagement with deceased to come to his house that night to assist defendant in moving a still owned by the latter. The theory of the commonwealth being that defendant had adopted this ruse to decoy deceased to defendant's home and there assassinate him in the absence of competent witnesses and leave the impression that he did this in protection of his honor as well as in self-defense, while that of defense is that deceased was despoiling his home, that he slipped away from McCoy's for that purpose, and when surprised in the act attempted to take the life of the outraged husband.

It is urged that the court erred to the prejudice of the defendant in the introduction of evidence. K. S. Johnson, a witness for the commonwealth, testified to having heard a threat made, but could not remember the words, and was asked if they were, "That if he could get James Johnson gentle enough to go to his home that he would shoot his G—— d—— guts out;" and answered that something like that was said; that they were drinking and he could not remember just what was said. The commonwealth pressed very hard for the defendant's statement, but the most the witness would say was, "Something like that was said." He was then asked about an affidavit he had made in reference to the matter and admitted having made such affidavit. He was asked at length as to how the affidavit read, and finally the affidavit was presented to him, and he admitted his signature thereto, and it was introduced in evidence. It reads: "Two men appeared before me personally known as S. W. Johnson and K. S. Johnson. After being duly sworn states on oath that Eli Johnson told them 'that if he could get Jimmie Johnson gentle enough to go to his home he would shoot his G—— d—— guts out.' This was just a short time before Jimmie Johnson met his death at Eli Johnson's home. Eli Damron, Justice of Peace, Floyd

County. Signature of the two men who made the affidavit, signed S. W. Johnson, K. S. Johnson.''

On cross-examination the witness stated that he was drunk at the time he made the affidavit. K. S. Johnson was also introduced by the commonwealth and the course of his examination was practically similar to that of S. W. Johnson. Later the commonwealth introduced Squire Damron and proved by him that the parties swore to the affidavit and were not drunk at the time. While an objection was not made and an exception taken to each question and answer, such action was taken in several instances and authorizes a review of the court's ruling on the subject.

As these witnesses were apparently unfriendly to the commonwealth, the trial court in its discretion might properly allow the commonwealth's attorney some latitude in propounding leading questions to them. He may have extended this to permit them to examine the paper which they had signed for the purpose of refreshing their recollection without divulging its contents to the jury. But it was highly improper to permit the commonwealth to read the affidavit, either as substantive or as evidence for the purpose of impeachment. True, section 596 of the Civil Code authorizes ''the party producing a witness'' to ''contradict him by other evidence and by showing that he has made statements different from his present testimony.'' But this rule has been restricted to cases in which the evidence of the witness is prejudicial to the party producing him and has never been applied to cases in which the witness merely fails to prove what is expected of him and says nothing to prejudice the party's case. To permit evidence of former statements of such witness, which are injurious to the adverse party, under the guise of contradiction, especially without any admonition as to the purpose of its introduction, is in effect substituting hearsay evidence for substantive testimony, and where objection is made such practice is uniformly condemned. Cf. Couch v. Com., 202 Ky. 667, 261 S. W. 8; Champ v. Com., 2 Metc. 17, 74 Am. Dec. 388; Loving v. Com., 80 Ky. 507; Blackburn v. Com., 12 Bush, 181; Garrison v. Com., 122 Ky. 288, 93 S. W. 594, 29 Ky. Law Rep. 411; Civil Code, sec. 596; Whitt v. Com., 27 Ky. Law Rep. 50, 84 S. W. 340; Couch v. Com., 216 Ky. 753, 288 S. W. 693.

As this evidence was of the most damaging character, it was manifestly most prejudicial and its introduction necessitates a reversal of the case. No other questions are considered.

Wherefore the judgment is reversed, and cause remanded for proceedings consistent with this opinion.