# Ky. Distilleries & Warehouse Co. v. Wells' Guardian.

### (Decided June 21, 1912.)

### Appeal from Franklin Circuit Court.

1. Master and Servant—Former Appeal—Evidence—Submission to Jury.—In an action for damages for injuries sustained in falling into a vat of scalding water, while there is some difference in the testimony of the injured boy as to how the injury was occasioned, from that upon the former trial, there was · sufficient evidence to take the case to the jury upon the question as to his direction of a route to carry the hose, and the instruction complained of submitting the case to the jury upon the evidence of the boy as to the manner in which he carried the hose was not error.

2. Witnesses—Testifying Differently Than on Former Trial.—The fact that a witness upon one trial may testify differently from what he said upon a former trial, to the utter surprise of the party introducing him, is not to be considered in the granting

or refusing of a new trial, unless proper precedent steps were taken at once when the surprising testimony disclosed itself.

3. New Trial—Surprise.—While the defendant moved for a postponement, or a temporary adjournment of the trial, it gave to the trial court no other basis of a postponement than the appearance of the witness himself, and it cannot be said that the trial court abused his discretion in taking the witness in an adjacent room so that he could examine him with a view of determining his mental condition. It is not made to appear that information from physicians could not have been laid before the trial court before the case was submitted to the jury, and the failure of the defendant to furnish this information must make it abide by the case as made out by it.

4. Verdict—Question Whether Excessive—Evidence.—In its more recent decisions this court has declared its adoption of a more liberal policy in sustaining verdicts of larger amounts, and the injury sustained by appellee being such that he cannot use his legs for manual labor, and the possibility, that, upon reaching manhood, their amputation may be necessitated, it cannot be said that a verdict for $12,000.00 is excessive.

WM. MARSHALL BULLITT, BROWN & NUCKOLS, GROVER C. SALES and BRUCE & BULLITT for appellants.

GREENE & VANWINKLE, GUY H. BRIGGS for appellee.

OPINION OF THE COURT BY JUDGE WINN—Affirming.

This case has been here upon a former appeal. Wells v. Ky. Distilleries & Warehouse Co., 144 Ky., 438. It will not be necessary here to recount the major portion of the facts appearing upon the present trial as the statement in the former opinion sets them out fully. There appeared, however, upon the second trial certain substantial differences in the testimony, which will be elaborated post. Upon the first trial there was a verdict for the defendant, which was reversed by this court in the opinion above cited. Upon the second trial the plaintiff obtained a verdict and judgment for $12,000, to reverse which this appeal is prosecuted. A number of errors are assigned: (1) That the damages are excessive; (2) that the testimony hurtful in character to defendants, resulting from the physical and mental condition of the defendant and witness Morris while testifying for the defendants upon the second trial was such surprise as that ordinary prudence could not have guarded against it, and as that the trial court erred in refusing to postpone the taking of his testimony until he should have had time to

rest and recuperate; (3) that erroneous instructions were given; (4) that incompetent testimony was admitted.

We pass now to a discussion of the differences between the testimony upon the second trial and that given upon the first. This testimony is that of two witnesses, the plaintiff, Phythian Wells, and the defendant William Morris. Upon the former trial the boy plaintiff testified that Morris indicated the position of the hole through the brick wall and said (quoting now from the testimony as detailed in the former opinion), "Go up yonder and pull the hose through that hole in the wall and I will go around into the building and shove the hose through and turn the water on when you get the end of the hose in the tub." Upon the second trial this same witness testified as to the immediate transaction in the following way:

"Q. What did he (Morris) say when he got there and what was done?

"A. He pointed up to this hole and says, 'I want you to pack a hose through.'

"Q. Where did he say you would get the hose?

"A. He said he would poke it out the hole.

"Q. What did you do?

"A. I came around here and went up this ladder (indicating).

"Q. Where was he when you started from where you left him to go to the ladder, had he gone back this way to the gate?

"A. Yes, sir."

Upon the second trial it was made to appear beyond question that a boy the size of Phythian Wells could have gone between or through the space between the two tubs and reached a point immediately under the hole through which the hose was to be protruded, without going upon the top of the tub into which he fell. The boy denied all knowledge of this route between the tubs. Upon the first trial his testimony was in effect that he was told to go up yonder (i. e., to the hole) and pull the hose through, directions which if followed necessitated his pursuing the route which carried him over the top of the tub; while upon the second trial his testimony was that he was directed to pack a hose "through"—the argument being that "through" could not mean "over." The instruction given upon the first trial (which, subject to a certain criticism set out in the former opinion, was said to be correct and which the court indicated should be given

upon the second trial) subjected the defendants to liability if the jury believed from the evidence that the boy "was requested or directed by said Morris * * * to go on said tank or vat." This instruction with the modification named in the former opinion was given upon the second trial; and of this the appellants make complaint upon the theory that the boy's testimony on the second trial did not tell of any request or direction to go over the tub. The only other witness who gave any substantive testimony upon this precise point was the defendant Morris, who, upon the second trial, testified that he did not tell the boy to go upon the tub; that it was not necessary for him to go there to get the hose; that he had no reason to think that the boy would go upon the tub, and that he expected him to go through between the tubs and not upon it. No other witnesses were present and no other witnesses saw, so far as the record discloses, the boy and Morris together just prior to or at the time of the accident. The appellants, therefore, say that since there was no evidence in the record of a substantive nature tending to show that the boy was directed to go upon the tub, it was error for the trial court to submit to the jury any right to find for the boy upon their belief, drawn from the testimony, that he was requested or directed to go upon the tub. Upon the other hand the appellee says that the trial court gave the instruction with its modification as approved in the former opinion, that the evidence was substantially the same on both trials, and that the law of the case then is the law of the case now. There were in addition several witnesses introduced who testified that Morris had stated in their presence, in substance, that it was his, Morris', fault that the boy was hurt, and that he had sent the boy upon the tub. The court limited the effect of this testimony to its sphere as contradictory of the witness Morris. These witnesses testified in rebuttal. The trial court permitted as well a witness in chief, one A. F. VanHoose, affirmatively to testify that in a conversation with Morris the latter had told the witness that he had directed the boy to go upon the tub. Over objection the court admitted this testimony; but at the conclusion of the trial, the court evidently having reconsidered its ruling upon the general admissibility of this testimony, instructed the jury that VanHoose's testimony as to this conversation was to be regarded only as contradictory of Mr. Morris and not as substantive testimony. It results,

therefore, that the court in submitting the case to the jury must have done so upon the testimony of the boy alone. In the testimony above detailed the boy said that Morris pointed up to the hole and told him to go get the hose. He further says that he did not know of the route around between the tubs and, in substance, that the route over the tub was the only feasible or known route to him. Under these conditions it seems to us that there was sufficient evidence to take the case to the jury upon the question of whether Morris had requested or directed the boy to pursue the route which he did pursue in reaching the point where he was to go, the hole in the wall to which Morris had pointed and through which the end of the hose was to be obtained. It results, therefore, that the trial court committed no error in the instructions given submitting the case to the jury upon the testimony detailed.

The second marked distinction between the testimony given upon the first trial and that upon the second rests in the testimony of the defendant and witness William Morris, the servant of the appellant Ky. Distilleries & Warehouse Co., whose immediate fault, if fault there was, was the cause of the boy's injury. Upon the second trial this witness testified upon cross examination that in his conversation with the boy he did not tell him a word about how to go get the end of the hose; while upon the first trial he testified that he told the boy to go right through there to that hole in the wall. Upon the first trial this witness testified that after talking with the boy and making the arrangement he went around inside the distillery for the purpose of putting the hose through the wall, and just as he was ready to put it through he looked through the hole and saw the boy disappear. Upon the second trial, upon his direct examination, he testified that he did not see the boy at all after he, the witness, had gone inside the building. He testified upon the first trial in detail about which way the boy was seen standing over the tub and that he had not been aware of the boy's presence upon the tub until he had seen him there. Upon the second trial the witness testified that he had no recollection of making any such statement. Upon the second trial Morris testified that there was no difference or enmity between him and the witness VanHoose. Upon the first trial he testified that he did not tell VanHoose that he had directed the boy to go on the tub, and that he, the witness, and VanHoose were not on speaking

terms at that time. Upon the second trial he further elaborated that he and VanHoose had never had a cross word in their lives. There were other distinctions or contradictions between his testimony upon the second trial and that upon the first. When the plaintiff's rebuttal testimony came on his counsel introduced the transcript of the testimony upon the first trial and showed the detail of each contradiction. Counsel for defendants, realizing that Morris was not testifying as he had before, near the close of the direct examination of Morris moved the court to adjourn the hearing until the following morning, or to temporarily excuse Morris until he could be treated by a physician and procure sufficient rest to regain his normal state. This motion was overruled and exception saved. During the cross examination of the witness, as appears from the stenographer's notes, upon objection by defendants to his further testifying the court called Morris to the bar and questioned and examined him for the purpose of determining his condition; after which he permitted the examination of the witness to go on. Shortly afterward upon a similar objection the court called the witness into the judge's private office and in the presence of counsel for both sides talked to the witness for the purpose of ascertaining his mental condition, and permitted him to continue his testimony. This much of our statement of what transpired is taken from the body of the record preceding the verdict and judgment. Upon the motion for a new trial upon the ground that the court abused its discretion in failing to sustain the motion to adjourn the examination, owing to the condition of Morris, and upon the ground that his condition resulted in accident and surprise against which ordinary prudence could not have guarded the defendants filed the affidavits of three witnesses, which may be briefly digested thus:

Richard Morris, the father of William Morris, stated, in substance, that William Morris had been struck upon the head on the 18th of December, 1911, with a club some 6 feet in length and 2 by 4 inches in size; that he was rendered unconscious by it and bled profusely; that the wound had to be sewed up; that he continued very weak as the result of this injury and did not return to work until the 8th of January, and that he was still quite weak; that on January 11th the day after the one upon which he testified upon the second trial, he was in such a nervous and weakened condition that although he had

gone to his place of work he had been unable to attend to his duties and had spent the greater portion of his time lying down; that at various times after receiving the blow and both before and after he testified as a witness William Morris had complained to the father of feeling weak and dizzy, of his vision being blurred, that if anyone would speak loudly to him he felt as if the top of his head would fly off, and that he was upset by any unusual noises; that William Morris had frequently told him, the father, in recounting the facts about the accident, that he had looked through the hole in the wall and had seen the boy on top of the tub; that after the second trial the father had asked the son how it was that he had testified that he did not see the boy, and that the son had answered that upon the second trial he had become confused or was unable to remember just how the matter occurred at the time.    Dr. L. T. Minish also made one of the three affidavits.    He told of the wounds inflicted upon Morris by the blow and of his treatment of them; that on the 24th of December he had a temperature of 102 1-2 degrees when the physician opened the wounds again and placed drains in them; that on December 26th, 27th, 28th, 29th, 30th, January 1st, 3rd, 5th, 6th, 8th, 10th, 13th, 17th and 20th Morris visited the affiant's office for the purpose of having the wounds dressed and that he would continue to need treating and dressing for sometime; that on the 6th or 8th of January, the precise date the affiant was unable to state, the witness came near fainting in his office and was obliged to lie down and rest for the space of about one hour before he was able to leave; that on that occasion Morris had a temperature of 103 degrees, and that it was affiant's impression that upon that occasion his condition was more serious than it had been at any time theretofore; that in affiants' opinion the character of the injury was such that a concussion of the brain must have been produced, though there was no injury to the skull; that in his, the affiant's opinion, the nature of the injury was such as that it might have produced a temporary mental derangement, and that to have subjected Morris to the excitement incident to the trial in the condition in which he was on the 10th and 11th of January would very probably result in a temporary mental derangement such as might have manifested itself by either a partial or total loss of memory or loss of the power of connected thought.

The third and last affidavit filed was that of J. A.

Wathen, the supervisor of the appellant corporation, who had general charge of the distillery where the accident occurred and of the preparation of the defense at both trials. He states that upon the first trial the witness, William Morris, testified correctly and intelligently; that the blow upon the head of Morris had been struck from behind by a negro government storekeeper; that the affiant and the attorneys for the Ky. Distilleries & Warehouse Co. in charge of the preparation of the trial talked with Morris a number of times during the four or five days preceding the trial, and that all of these times he seemed to be perfectly rational, and although suffering from the blow upon his head showed no incapacity to think clearly, and that none of those acting for the defense had any reason to believe that his mental condition was not normal; that upon the trial, however, the excitement incident to his examination caused him to become nervous and and irrational and to act in all respects like a man who had lost his mind or was under the influence of intoxicating liquors; that upon the trial, before the attention of the court had been directed to Morris' condition by counsel for defendants, the court had observed his manner and had asked him if he were not intoxicated; that the court a few minutes later called Morris from the witness chair to the bench and away from the hearing of the jury to ascertain whether he was intoxicated; that such examination disclosed no evidence of intoxication and that Morris stoutly and vehemently maintained that he was neither drunk or irrational; that yet at a later time the court together with Morris and attorneys for the respective sides went into a separate room and questioned Morris to ascertain whether he was drunk, but that the examination disclosed that he was not, and that when it was suggested that he was not rational as the result of the blow, he had protested vehemently, gesticulating with his arms, that he was neither drunk nor irrational; that the court thereupon permitted the trial to continue; that the defendants did not know before Morris was placed upon the stand his condition, and that ordinary prudence could not have guarded against the condition in which the defendants found themselves involved by the manner of his testimony upon the second trial.

Upon the record as detailed above and upon these affidavits the defendants urged that the trial court was in error in not suspending the trial or postponing the

examination of the witness; that this error should have resulted in the granting of a new trial, and that it now constitutes a valid ground of reversal. It is not to be seriously contended that the testimony of this witness upon the second trial was not most injurious to the defense. Confronted time and again before the jury with the record evidence of his diametrically opposite testimony upon the former trial he must have made an impression upon the jury more hurtful to the defense than would have been his entire silence upon the second trial. His testimony upon the second trial is inexplicable. And yet the fact that a witness upon one trial may testify differently from what he said upon a former trial, to the utter surprise of the party introducing him, is not to be considered in the granting or refusing of a new trial unless proper precedent steps were taken at once when the surprising testimony disclosed itself. Ivers v. Avery & Sons, 6 K L. R., 220. Let us recur now to our statement of the practice followed when the contrariety of Morris' testimony became apparent. Before the verdict, insofar as the record discloses only these steps were taken, towit: Near the close of the direct examination of Morris, defendants' counsel moved that the hearing be adjourned until the following morning or that Morris be temporarily excused while he might be treated by a physician and might procure sufficient rest to regain his normal state.

Again, during the cross examination of the witness the court, upon objection by defendants to Morris' further testifying, called him to the bar and questioned and examined him for the purpose of determining his condition. The court then permitted the witness to continue; and shortly afterward, upon a similar objection, the presiding judge, the witness and counsel for both sides adjourned to the judge's private office, where the presiding judge talked to Morris and examined him for the purpose of ascertaining his mental condition. Again he was permitted to continue. When the case, therefore, went to the jury there was nothing in the record showing the violence of the blow upon Morris' head, or that it had caused a concussion of the brain, or affected him nervously, or that it might cause a mental derangement, or that he had had an elevation of temperature, or had been subjected to the surgery of having his head wound sewed up, or that there was any reason why he testified upon the second trial differently from what he had upon the first.

The trial judge is authorized to exercise his discretion in such a matter. It is not a subject for review by us unless his discretion has been abused. Illinois Central Ry. Co. v. Doss, 137 Ky., 659; Henry Vogt Machine Co. v. Pennsylvania Iron Works Co., 23 K. L. R., 2163. Nothing was before the trial judge when the case went to the jury, insofar as the record discloses, save the appearance and demeanor of the witness and the fact that he was testifying contrarily to what he had theretofore testified. The trial judge looked him over, talked to him, and finally went into a separate room with him and in the presence of counsel there looked at him and talked to him to determine whether he was rational. There is no way for one non-medical mind to so surely grasp the condition of the mind of another as to come in contact with it. This was done here, and the presiding judge looking at Morris and talking to him concluded that he was in sound mental condition. How are we to say that the judgment of the trial court was abused? Unfortunately for the defendants, instead of coming forward with the almost conclusive affidavit of the physician showing that Morris' condition was not sound, they saw fit to hazard their chances of a verdict before giving to the trial judge the benefit of this information. Mr. Wathen knew that the blow had been struck and immediately when Morris testified as he did the possible effect of the blow must have suggested itself to the defense. The case was not concluded until at least the first day after, and possibly the second day after, Morris testified, the record not being clear upon this point. At any rate, there was ample time for the defense to have obtained this physician and his affidavit and to have put in the record the affidavits of the father of Morris and of Mr. Wathen himself. Had they done so instead of taking their chances upon a verdict, and had the trial court, with these affidavits in, yet enforced the defendants to proceed with the trial, a very different case would be before us for review. In the case of Shipp's Admr. v. Suggett's Admr., 9 B. Mon., 5, a witness introduced by plaintiff was intoxicated when called upon the stand and was so stupefied as that his testimony was virtually lost to the plaintiff. The plaintiff filed his affidavit in support of a motion for a new trial, setting up that he was wholly unapprised of the condition of the witness until he had been called and sworn. This court said that the matter presented by the affidavit was not sufficient to authorize a new trial, upon two grounds: (1)

That the witness was examined upon the trial, that his condition, therefore, was apparent to the court, and that whether or not the plaintiff had been injured by the condition of the witness was a matter about which the circuit court that witnessed the whole affair could much better judge than could this court from the affidavit of the plaintiff; and (2) that the correct practice in such a case for the party, at once upon the discovery of the matter which operates as a surprise to him, during the progress of the trial, is to move a continuance or postponement of the trial and not to attempt to avail himself of the chance of obtaining a verdict on the evidence and then if he should fail, to apply for a new trial on the ground of surprise. In the case at bar the defendants did move for a postponement or a temporary adjournment of the trial, but gave to the trial court no other basis of a postponement than the appearance and testimony of the witness himself. The defense should then and there, or at least in some timely way before submitting the case to the jury, have given to the trial court before the verdict, the benefit of the information as to the injury to Morris' head and its physical and possible mental effect upon him, so that the court might be advised of the real facts. They should not have waited until after the hazard of the verdict had gone against them and then for the first time make apparent the trouble with their witness. The reasonable rule of the Shipp case is followed in Monarch v. Cowherd, 114 S. W., 276. No one for the defendants states that this information could not have been laid before the trial judge before the case was submitted to the jury, and the defendants must abide by the case as made by them. This disposes of the second ground of complaint.

It is next urged that the verdict of $12,000 is excessive and manifestly was given under the influence of passion and prejudice. It becomes necessary to detail in the consideration of this proposition somewhat of the testimony introduced upon the trial as to the nature, extent and permanence of the boy's injuries. At the time of the injury the boy was nearly 14 years of age. His pain and suffering were intense. His burns extended from his crotch down. The testimony disclosed that, when the bandages were removed more or less of the skin would come away with the bandages; that likewise the flesh would sometimes slough off; that he was on crutches for some eight or nine months and continuously since that time has used a cane in walking; that with this cane he

had sometimes walked the two miles lying between his dwelling house and his school, but that he could not walk both ways in the same day; that almost completely around his legs was certain scar tissue, which, according to the physicians testifying, had a tendency to contract; that his legs were scarred, somewhat bent, and so weakened as to preclude any manual labor that might involve the use of his legs; that it was possible that if the boy should gain materially in flesh the scar tissue would not expand accordingly, and in the opinion of one physician the binding effect of this tissue around the legs would necessitate their amputation. On the other hand, it appeared that the boy had grown some six or eight inches in height in the time intervening between the accident and the second trial; that he had gained perhaps fifty pounds in weight; that his appetite was good; that he slept soundly; and that he had been seen upon the top of the fair ground amphitheatre while it was being repaired, the only access to which was by means of climbing a steep ladder some twelve feet in height. There is, of course, no fixed standard by which it can be definitely said when any given verdict is excessive. However, it may be remarked that in its more recent decisions this court (L. & N. Railroad Co. v. Engleman, 146 Ky., 19) has declared its adoption of a more liberal policy in sustaining verdicts of larger amounts; and has further remarked (L. & N. Railroad Co. v. Melton, 127 Ky., 276) that a larger verdict might be sustained for wrecking the living body than for the infliction of death. When we consider that young Wells' legs are such as that he can not use them ever for manual labor and that the scar tissue binding around they may, upon the growth incident to his approaching manhood, necessitate their amputation, it seems clear to us that the verdict was not excessive.

The fourth and last proposition is that incompetent testimony was admitted in favor of the plaintiff over the objection of the defendants. The testimony objected to was that of VanHoose, above pointed out, and of the witnesses introduced in rebuttal who were permitted to testify as to the statement alleged to have been made by Morris that the matter was his fault and that he had sent the boy upon the tub. With this proposition we have not much difficulty. It is true that it was not admissible as substantive testimony against the Ky. Distilleries & Warehouse Co.; and the court admitted it with

this express limitation. The testimony was undoubtedly competent against Morris as in nature testimony of admissions against interest. The court, however, did not permit the testimony to go that far, but expressly limited its admission as in contradiction of Morris. There was no error against the appellants in the admission of the testimony with the limitations placed upon it by the court. The case of L. & N. Railroad Co. v. Webb, 99 Ky., 332, is not in point, for there the conductor, whose testimony bore the same relation to the case as did that of the defendant Morris here, was not a party to the litigation. The testimony as to statements made by the conductor was condemned under the familiar rule of being no part of the res.gestae. In the case at bar Morris himself was a defendant and whatever he may have said was competent against him and, for the purposes of contradiction only, against his co-defendant. Had the testimony been an immediate part of the res gestae it would, of course, have been competent as substantive testimony against both the defendants. It is to be presumed that the jury heeded the admonition of the court.

The case upon the whole is predicated upon the law as declared in the former opinion of this court. We are not, therefore, permitted to review the relation of Morris to the Ky. Distilleries & Warehouse Co., nor the right of the appellant to charge the Ky. Distilleries & Warehouse Co. with these particular acts of Morris; nor again to review the distinction between this case and that of Corrigan v. Hunter, 122 S. W., 132; all of which propositions are again suggested by the appellants.

The judgment of the trial court is affirmed.