## Hall v. Commonwealth.

(Decided September 24, 1920.)

### Appeal from Fayette Circuit Court.

1. Criminal Law—New Trial—Newly Discovered Evidence—Cumulative Evidence.—A new trial will not ordinarily be granted upon the ground of newly discovered evidence, which is cumulative only or which merely impeaches a witness or witnesses upon the opposing side. To authorize a new trial for such cumulative or impeaching evidence it must be of such preponderative nature as that it will be calculated to influence the jury and make it reasonably certain that a different verdict would be returned. But in no case will such newly discovered evidence be considered unless the party relying on it exercised due diligence to procure it for the trial.

2. Criminal Law—New Trial—Evidence—Surprise.—One may not be said to be surprised at the testimony of a witness or witnesses, tending to establish the contention of his adversary in the litigation since all facts and circumstances relevant to the claim

or contention of the adversary should be anticipated and expected unless perhaps the witness or witnesses giving such testimony had fraudulently misled or deceived the one surprised into the belief that no such testimony would be given.

3. Criminal Law—New Trial—Evidence—Surprise.—In order to take advantage of legal surprise during the process of a trial, the one affected thereby should at the time of the surprise make the fact known to the court and then ask for such relief as the facts authorize. In such cases he will not be permitted to remain silent until the return of the verdict of the jury and then for the first time rely on his being surprised.

4. Criminal Law—Trial—Objection to Admission of Evidence.—An objection to the admission of evidence must point out that which is claimed to be incompetent and it will not avail one to make a general objection to testimony as a whole when parts of it are competent although other parts are incompetent.

5. Criminal Law—Objection to Testimony—How Shown.—An objection to testimony must appear in the record and can not be shown by affidavits filed after the trial unless such proceedings are sufficient to constitute a bystanders' bill of exceptions.

6. Criminal Law—Procurement of False Testimony.—It is competent for the Commonwealth upon the trial of a criminal offense to prove that the defendant endeavored to procure a witness to give false testimony. Such testimony is relevant as a circumstance inconsistent with innocence and has a tendency to show a consciousness of guilt and forms one of the exceptions to the rule forbidding proof of independent crimes.

7. Criminal Law—View of Premises—Discretion of Court.—It is within the discretion of the trial court to permit a view of the premises and unless such discretion is so manifestly abused as to operate prejudicially to the defendant a new trial will not be ordered therefor.

JAMES G. DENNY and MILLER & MILLER for appellant.

CHARLES I. DAWSON, Attorney General, and T. B. McGREGOR, Assistant Attorney General, for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, James Frank Hall, upon his trial in the Fayette circuit court, under an indictment charging him with the murder of John Crawley, was found guilty of voluntary manslaughter and his punishment fixed at confinement in the penitentiary for a term of twenty-one years. Seeking a reversal of the judgment rendered upon that verdict, he prosecutes this appeal. Many grounds are stated in the motion and reasons for a new trial, filed by appellant, but his counsel on this appeal refer in their brief to only four, they being, (1) newly

discovered evidence; (2) the admission of incompetent evidence introduced by the Commonwealth over defendant's objections; (3) improper argument of the Commonwealth's attorney, and (4) error of the court in declining to permit the jury to view the premises where the killing occurred after the introduction of all the evidence. In the course of this opinion, we will neither refer to nor discuss any ground included in the motion and reasons for a new trial not urged in brief of appellant's counsel, since we are convinced from a reading of the record that there is no real foundation for them, a conclusion which we presume was also entertained by counsel, because of no reference thereto. However, the failure of counsel to refer to or discuss a meritorious ground, properly raised and presented by the record, would not of itself necessarily cause us to ignore it.

It will be necessary to a proper understanding of the contentions made in appellant's brief to make a condensed statement of the facts which the testimony introduced by both the Commonwealth and the defendant tended to establish. Defendant at the time of the killing with his two infant children by a divorced wife, resided at the home and with the family fo his father whose farm bordered on the Kentucky river in Fayette county. He is thirty-seven years of age and his victim, who was a brother of his divorced wife, was perhaps a few years younger. On the day of the killing defendant went across the river into Madison county with a physician whom he had called to see his afflicted mother, to procure some medicine prescribed by the physician. A part of the trip was taken on the river by a boat which belonged to him. The physican had recommended for his patient chicken broth, squirrel broth and perhaps other light diet, and defendant says that near four o'clock in the afternoon he took his gun and went in search of either a chicken or a squirrel with which to make the recommended diet for his mother. His brother Clarence Hall went along for the purpose of getting the mail from a post office or a box located in the direction defendant went. When the two had gotten less than a mile away from home, it is testified to by them, that they heard an explosion of dynamite in the river, whereupon they went to its bank through a cleared field and they saw the deceased near the center of the river picking up fish and that he was in defendant's boat, which the latter had used in going to the home of the physician and which he had tied at some point on the bank of the

river. That defendant then said to the deceased "Jack, what are you doing in my boat?" and that the deceased answered: "You God damned son of a bitch this is not your boat," when defendant again repeated that it was his boat and deceased replied: "I got it up at the pump house from Spurlock." Defendant again repeated that it was his boat and deceased replied: "Well, God damn you, as soon as I get through picking up these fish I will give it to you." The defendant and his brother then stood on the bank of the river for ten or fifteen minutes and deceased came with the boat to the bank and tied it to some willows and came up the bank towards defendant with one of the oars raised and said: "You have got your gun, but you are too big a coward to use it." Defendant then pointed his gun toward deceased and said "Don't do that," whereupon deceased dropped the oar and the fish which he had in the other hand and drew from one of his pockets an opened knife and started toward defendant with it. Defendant backed some distance, and then shot deceased, the load taking effect just below and to the right of the navel and making a hole entirely through his body about the size of a silver dollar. Defendant and his brother immediately departed leaving the deceased on the ground with his entrails protruding and went to their home where defendent claims that he told his father what he had done as well as the reasons therefor. The father, with his two sons, Clarence and Jack, then went to the place of the shooting and upon arrival they found deceased still alive and in the terrible predicament in which the defendant had left him, but they did nothing at the time to relieve his situation or to render him any comfort. They each testified that the father found and picked up the knife in the edge of some weeds within a foot or two of a pool of blood made from the wounds of deceased in the sand where he fell, and that within four or five feet between that point and the river they found the oar.

Among the witnesses introduced by the Commonwealth were John Ballard and Will Collins. The former testified in substance that at the time of the shooting he was on a bluff, above the bottom where it occurred, and heard it and also heard some one say "O, Lordy, don't shoot me any more." That he heard no prior explosion of dynamite, and in looking in that direction he saw defendant coming across the bottom toward his home. That in going down the hill toward the bottom he lost sight of defendant, but upon getting to the foot of the hill he met

defendant and his brother, Clarence, and asked defendant "What is that hollering up there?" and the latter said "Jack got hurt up there." Witness then asked, "What is the trouble?" and received the answer, "He was up there dynamiting and fooling with my boat and I asked him to stop and he wouldn't do it and I shot him." Witness then said "I am sorry you all had any trouble" and defendant replied "I am sorry I done it." Defendant and his brother Clarence in some respects contradict the witness Ballard as to what occurred or what was said at that meeting, the principal point of contradiction being that defendant instead of saying "I am sorry I done it" said "I am sorry I had to do it." The witness Ballard, immediately after this conversation, went to the place of the shooting and found deceased as above described, and he says that he was lying upon the sand with a barren space of some ten feet or more around him and that there was no knife or oar in sight. Witness then went in search of help to remove the deceased to some hospital or place where his wounds could be attended to. He went to a store about a mile away and found the witness Collins and one Jessie Brenigar; all three immediately as well as rapidly returned to the scene of the shooting and both Ballard and Collins testified that when they got between 150 and 50 yards of the place they saw standing around or near the body defendant's father, Ed. Hall, and his brother Jack Hall, and that Clarence Hall who was with defendant at the time of the shooting, was coming up from the river with an oar, but when he saw the Commonwealth's witnesses approaching he started back toward the river with it; that afterward the father handed to Ballard the knife, saying "Here's Jack's (John's) knife." All those present then arranged for and placed the deceased, who was still alive, in the boat and he was carried by Ballard and Collins up the river to Clay's Ferry, where he was put on a truck and started to Lexington. He was later removed from the truck to an automobile, but he died shortly thereafter and before arriving at Lexington. It is shown by the Commonwealth that on the trip up the river to Clay's Ferry deceased, who was still conscious, stated that in scrabbling around the knife had fallen out of his pocket and that it was opened by defendant's father after it was picked up. It is furthermore shown that on that trip deceased made a dying declaration to the effect that he did not know why defendant shot him; that he came walking up the bank "and he (defendant)

shot him (deceased)." It is quite clearly shown that bad feeling had existed between defendant and the deceased for at least as long as three and one-half years before the killing, it being about the time defendant and his wife separated, which was followed by a divorce.

One witness for the Commonwealth testified that about a year before the killing he heard defendant say at a country store in the neighborhood that "somebody was going to keep on fooling with his things down there until they got killed." It is shown that the "things" referred to were fish nets, boats, etc. Another witness testified that sometime after the separation between defendant and his wife he heard defendant say "that Jack (Crawley) caused all this trouble between him and his wife and if he didn't quit this trouble he would kill him."

Vernon Durbin, another witness for the Commonwealth, testified that about a year before the killing, while witness and others whom he named were drawing tobacco plants from a plant bed, there was a conversation (defendant being present and participating) about some one interfering with fish nets that had been set in the river, some of which had been stolen or appropriated, and that in the conversation some one mentioned the name of deceased, when defendant said "If Crawley was fooling around down there, he was liable to get hurt." Some of these statements were denied by defendant, but as to the others he said that he had no recollection of making them. As is usual in such cases, there are some contradictions and some other minor circumstances appearing in the testimony which remotely point to the defendant's guilt, but which we deem it unnecessary to set out. On the other hand, there are corroborating circumstances, pointing to his innocence, chief among which is that he went to Lexington on the day of the shooting and surrendered himself.

It is quite clear from the testimony, as related, that it can not be said that the verdict is flagrantly against the evidence. Considering the dying declaration, which is not attacked for incompetency, and the other facts and circumstances proven, including the threats and the state of feeling existing between defendant and his brother-in-law, the most that can be said is that the evidence is contradictory and the universal rule in such cases is that the court will not disturb the verdict of the jury, based upon such testimony, unless it be so flagrantly against the evidence as to indicate that it was the result of passion or prejudice on the part of the jury.

Turning now to the points discussed in brief of counsel the newly discovered evidence in ground (1) relied on consists in (a) the affidavit of Jessie Brenigar, in which he contradicts the testimony given by the witnesses, Ballard and Collins, as to Clarence Hall having the oar or coming from the river with it when the three returned to the scene of the shooting, as above related, and contradicting those witnesses also as to their ability to see the place of the shooting from the point where they said they could and did see it; (b) affidavits of a number of persons who visited the scene of the shooting after the trial and who state that because of natural formations, the witnesses, Ballard and Collins, could not see Clarence Hall from the point where they claim they saw him and that the place where deceased fell was so surrounded by weeds and other growth that the knife and the oar would have been hidden from the view of Ballard when he first arrived; (c) affidavits of some of those who were present at the plant bed upon the occasion testified to by the witness, Vernon Durbin, to the effect that no such threat was ever made by defendant as the witness testified to. It would seem that, notwithstanding the vigor with which these supposed errors are pressed, a mere statement of them is both convincing and conclusive that they are without merit. Aside from the objectionable fact that the alleged newly discovered evidence is both cumulative and impeaching in its nature, no rule is more firmly fixed than the one requiring the litigant, seeking the new trial upon this ground, to exercise reasonable diligence to obtain the testimony during or before the trial and make some effort to introduce it. This essential prerequisite is wholly lacking in this case. With reference to the affidavits of Brenigar and others as to the local surroundings of the place of the shooting, it may be said that one of the first important facts for the defendant to prove in a case like this one is the physical surroundings so as to place the jury as near as possible within the exact situation of the parties. But beyond this, the coroner of Fayette county, Ballard and Collins were the first three witnesses introduced by the Commonwealth, and they each testified in detail as to the surroundings and no effort seems to have been made to obtain testimony contradicting them although the trial extended over a period of more than two days, during which there was no process for witnesses issued at the request of defendant or any motion made for a postponement of the trial in order to obtain the testimony now

claimed to be newly discovered evidence; and surely it can not be said that diligence was exercised to obtain the alleged newly discovered testimony contradicting the witness Durbin as to what occurred at the plant bed after he gave the names of those present, some of whose affidavits are filed, there being no step taken by defendant to obtain the presence of those witnesses or their testimony. Even if it could be said (as intimated in brief) that defendant was surprised at the testimony of Durbin, this character of testimony is not sufficient to create legal surprise, so as to authorize a new trial therefor. Caldwell v. Spears, 186 Ky. 64. If, however, it were otherwise, it was the duty of defendant to make such fact known to the court and to have asked for either a continuance of the case or a postponement of the trial to enable him to procure the presence of the absent witnesses. Caldwell v. Spears, *supra;* Liverpool & London & Globe Insurance Co. v. Wright, et al., 158 Ky. 290; Howard v. Strawbridge, et al., 165 Ky. 88; Shipp's Administrator v. Sugett's Administrator, 9 B. Mon. 5, and Warehouse Co. v. Wells, 149 Ky. 275. So that in no possible view of the case are we enabled to find any merit in any of the matters included in ground (1).

The incompetent testimony, urged for a reversal, in ground (2) is the entire testimony of the witness Joe Bentley, who was introduced by the Commonwealth. The substance of his testimony was that before the trial defendant approached him and induced him to agree to testify that he saw the difficulty and that it occurred in a boat in the river and that the witness Collins had said to Bentley that he (Collins) had fixed up the dying declaration of the deceased. The witness further stated, on re-examination by the attorney for the Commonwealth, that he and his mother came to the Commonwealth's attorney as well as to the presiding judge of the court and stated to them what defendant had endeavored to do. This latter testimony, though incompetent, was in substance brought out on cross-examination of the witness by defendant's counsel; but waiving that point the record shows that none of the testimony of the witness Bentley was objected to. It is true that upon the motion for a new trial two affidavits were filed, one by defendant and the other by one of his counsel, stating that objections and exceptions were taken to the *entire* testimony of Bentley, but we know of no rule of practice permitting the record to be made up in this way. However, if we should, through leniency, treat the two affidavits as be-

ing sufficient to make a bystanders' bill of exceptions, this ground would then be without merit because the objections were directed to the testimony of the witness *as a whole,* when the rule is that such objections are not available when portions of the whole testimony objected to are relevant. Hoskins v. Commonwealth, 188 Ky. 80; Ellis v. Commonwealth, 146 Ky. 715; L & N. R. R. Co. v. Graves, 78 Ky. 74; Bronston v. Bronston, 141 Ky. 639; Harrod v. Armstrong, 177 Ky. 317; 16 Corpus Juris 878; 12 Cyc. 563; Jones on Evidence, sec. 894, and Encyclopedia of Evidence, vol. 9, pages 126-127. That portion of the testimony of the witness Bentley wherein the defendant tried to procure the witness to give false evidence was clearly admissible, although it went to establish the commission of an independent crime by the defendant. Such testimony comes within the exceptions to the rule forbidding proof of an independent crime. It constitutes a part of the conduct of the defendant having a tendency to prove consciousness of guilt and is analogous to that principle allowing proof of flight or efforts by defendant to procure the non-attendance of witnesses against him. In 16 Corpus Juris 555, the admissibility of such testimony as well as the grounds therefor are thus stated: "Fraud on the part of accused in the preparation or presentation of his case, such as the suppression, the destruction, or the concealment of evidence, or an attempt to destroy or to suppress evidence or to fabricate, manufacture, or procure false evidence, may be shown against him as an incriminating circumstance, inconsistent with innocence, and as tending to show a consciousness of guilt and that his cause lacks honesty and truth. Evidence is relevant to show that accused threatened or assaulted a witness or procured, or endeavored to procure, his absence, or endeavored to induce him to testify falsely."

In the case of Turpin v. Commonwealth, 140 Ky. 294, this court in discussing a similar point to the one now under consideration (bribing of a juror) said: "If one accused of crime flees, or attempts to bribe a witness, or a juror, or to fabricate evidence, all such conduct is receivable as evidence of his guilt of the main fact charged. It is in the nature of an admission. For, it is not to be supposed that one who is innocent and conscious of the fact would flee, or would feel the necessity for fabricating evidence. (Moriarty v. Lou. C. & C. Ry. Co., L. R. 5 Q. B. 314; Winchell v. Edwards 57 Ill. 41; Commonwealth v. Webster, 5 Cush. 316; Commonwealth v. Brigham,

147 Mass. 415).'' Since portions of the testimony of the witness Bentley, the *whole* of which was objected to, was relevant the defendant's objections, if shown by the record to have been made, were insufficient to reach the irrelevant and incompetent portions of the witness' testimony and we are not therefore authorized to sustain this ground.

The argument of the Commonwealth's attorney, complained of under ground (3), was a reference made by him to the incompetent portion of Bentley's testimony, and since it may not be excluded for the reasons stated above the argument based thereon can not avail the defendant.

Neither are we impressed with the soundness of ground (4) as a reason for granting a new trial. It is always within the discretion of the presiding judge as to whether or not he will permit a view of the premises and such discretion will not be interfered with on appeal unless it appears from the record that there was a clear abuse of it to the substantial prejudice of the one making the motion. It has often been so determined by this court. In the instant case the place of the shooting was some fifteen or more miles from Lexington, where the trial was had. Considerable changes in the surroundings had necessarily occurred since the time of the shooting. The blood spot where defendant fell had of necessity disappeared, and there had also been a marked change in the growth of vegetation, etc., and in the language of defendant's counsel used when the Commonwealth made a similar motion, after stating that he did not object, said ''we don't see any reason for it.'' He afterwards, however, at the close of the testimony, made the same motion. We can see no abuse of discretion on the part of the court in overruling the motion, nor are we able to see wherein his action prejudiced the rights of the defendant. Finding no legal reason entitling defendant to a new trial, the judgment is affirmed.