## Manning v. Commonwealth.
## Sowders v. Commonwealth.

January 18, 1949.

G. D. Milliken, Jr., and E. R. Gregory for appellants.

A. E. Funk, Attorney General, and Zeb A. Stewart, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HELM—Dismissing appeal and affirming judgment.

Separate indictments were returned against appellants, charging each of them with the robbery of Lucian Shields on or about December 16, 1947. By agreement, the causes were tried together. The jury returned separate verdicts; one finding Manning guilty and fixing his punishment at two years in the penitentiary, the other finding Sowders guilty and fixing his punishment at two years in the penitentiary.

Each filed motion for a new trial. The motion of Sowders was overruled, and judgment of the court was in accordance with the verdict. The transcript includes a bill of exceptions which shows that the motion of Manning was also overruled; that he excepted and prayed an appeal to the Court of Appeals which was granted, but no judgment as to Manning appears in the record.

Counsel, in their brief for appellants, assign three errors: (1) That the court erred in permitting Commonwealth witnesses to express opinions and conclusions; (2) that the court erred in permitting the introduction by the Commonwealth of evidence which was calculated to and did create prejudice against the accused and sympathy for the prosecuting witness, and (3) the Court erred in permitting the Commonwealth to introduce evidence of an alleged compromise to the prejudice of the appellants.

The prosecuting witness, Lucian Shields, testified that about December 16, 1947, he came from his home in Allen county to Bowling Green to buy a twenty-two rifle for his boy; that when he arrived in town he had about $45 in money and a tobacco check for $359.92; that he cashed the check, putting the money into a leather bill fold; that he also had a small day book in his pocket; that he bought some articles at Pushin's for about $16; that he came alone; that he was married and had six children; that he bought a twenty-two rifle for $13.50, and a half-pint of "peach liquor" for $1.15; that he met Harold Sowders and Paul Manning in a pool room; that about 2 p. m. Manning asked him to play pool; that Sowders came over to where they were playing; that he played four games for money—a quarter a game; that he broke even; that they stepped out back and drank the liquor; that Sowders tried to sell him a knife; that he played two more games, and that they asked him about playing poker. He states that they went upstairs at the lower drug store on Main Street; that they left the pool room about two-thirty or three; that he lost about $4 in a "no limit" game of stud poker; that when he left the game he had about $360 in his pocketbook, and that he went to get the 4 o'clock bus but missed it.

He says that Manning told him he had a car and would take him home for $2.50; that he accepted and

that as they walked along the street they saw Bill Van Meter in a Chevrolet car; that Manning said, "here is one of my cars now;" that he went in the car with Manning and Van Meter to get his packages and find Sowders, and that they left Bowling Green by the Cemetery Pike; that it was "dusky dark;" that he and Manning were in the back seat, and Van Meter and Sowders on the front seat; that at the forks of the road he told them the road to the right was the road to his home; that Manning said, "Sowders is drunk and he lives right down there" and that they started down the other road to take him home but after going about a half-mile, to a point which looked like the end of the road, they stopped; that Manning, Sowders and he got out of the car; that they walked 150 or 200 yards when both Manning and Sowders grabbed him, scuffled with him, threw him down on the ground, and both of them got on top of him; that they took his knife, felt around and found his pocketbook, took it and ran; that he started back to town, got a ride with Thomas Ray Taber, reported to the police what had occurred, and identified the defendants for the police.

On redirect examination, Shields stated that on Tuesday before the trial he met Manning and Sowders and a man named Stovall on the road; that Stovall got out, came to his wagon and wanted to know if he would talk to them; that he told him: "Yes, if they will talk the right way;" that Manning then asked him if was going to Bowling Green tomorrow and said: "We want to talk to you, want to compromise with you;" that he told them: "It is too late now, you will have to meet me at the Court House." He stated that they offered him $500 not to come to court; that "they wanted to put up $250 that day for me not to come Wednesday."

The police officers testified that Shields reported to them that he had been robbed of some $360; described the car in which he had ridden, packages which he had left in the car and which were found along the road by the officers and Shields, and described the place pointed out by Shields where they found a day book. The place was marked up with heel prints where there seemed to have been a scuffle. Objection was sustained as to the shoe marks indicating there had been a scuffle. When asked as to the man's condition, the police stated, "On

his back he had grass and dirt, all looked like he had been down on the ground.''

Thomas Ray Taber testified that he brought Shields from Tress' store, about four miles out on the Cemetery Pike, to Bowling Green the night Shields complained of being robbed, and that Shields had been drinking but was not drunk.

The appellant, Manning, testified, in substance, that about 12:30 on the day he was arrested he saw Shields in the Rex pool room across from the bus station; that about 1:30 he, Shields, Sowders and others went to the room of Herbert Klein on Adams Street where they played poker; that Shields was ''pretty well drunk'' and that he lost practically all the money he had in the poker game. He stated that he, Sowders, Van Meter and Shields got out of the car; that Shields ''wanted to shoot some craps to try to get some of his money back;'' that Shields got mad because they wouldn't gamble with him so he could have a chance to win his money back; that they offered to take him back to town or take him home; that he was mad, sat down on the bank and wouldn't get back in the car; that they put out his packages and left him there, telling him ''he could get home anyway he wanted to.''

Hubert Stovall of Scotsville, a witness for appellants, testified that he had been acquainted with Shields, Manning and Sowders for some years. He stated that Shields ''wanted to get this settled some way with these boys;'' that Shields agreed to take $500 and drop it; that Shields was poor and needed the money.

Shields, recalled, testified that Stovall approached him about negotiating with the appellants; that he didn't approach or say anything to Stovall about a settlement, and that he advised him that the only settlement that could be made was in the court room.

No objection was made to the evidence that Shields was married and had six children, or that he was a tobacco farmer living near Settle, in Allen county.

Stovall, a witness for appellants, on cross-examination, stated that Shields wished to settle because he needed the money. No objection was made to this ques-

tion or answer. He was asked: "Is he rich or poor?" Stovall answered: "Poor." Objection was made; the objection was overruled, and exception saved. Objection should have been sustained to this question and answer, but its admission was not substantially prejudicial.

Appellants say that Shields sought to compromise with them. Shields says the appellants offered him $500 not to prosecute them. This was a question for the jury. The jury evidently concluded that appellants sought to suppress the prosecution of these cases.

It is competent for the Commonwealth upon the trial of a criminal offense to prove that the defendant endeavored to suppress evidence by bribing a prosecution witness not to appear and testify. Such testimony is a circumstance inconsistent with innocence, has a tendency to show a consciousness of guilt, and forms one of the exceptions to the rule forbidding proof of independent crimes. Hall v. Commonwealth, 189 Ky. 72, 80, 224 S. W. 492; Bennett v. Commonwealth, 175 Ky. 540, 194 S. W. 797; Roberson, Kentucky Criminal Law and Procedure, second edition, section 1824. See 6 West Kentucky Digest, Criminal Law, Key 351 (8), Key 351 (10).

No judgment as to Manning appears in the transcript of the clerk. The clerk of the Warren circuit court certifies that his transcript is a complete and correct copy. Presumably, Manning was not sentenced and no judgment was entered as to him. Section 335, Criminal Code of Practice, provides that "An appeal shall only be taken on a final judgment, except on behalf of the Commonwealth." Shepherd v. Commonwealth, 284 Ky. 30, 143 S. W. 2d 725. See also Gosney v. Commonwealth, 309 Ky. 187, 217 S. W. 2d 225.

The evidence for the Commonwealth was ample to support the verdicts of the jury.

In the Manning case, the appeal is dismissed; in the Sowders' case, the judgment of the lower court is affirmed.